The trial court granted summary judgment in favor of a building owner sued by two injured employees of an independent contractor who was modifying the building. The learned trial judge entered the following order granting summary judgment. We affirm that judgment and adopt the trial court's order as the opinion of this Court:
"A. Motion by Dixie for Summary judgment.
"Bacon and Tuggle make claim for the injuries and damages they sustained on December 2, 1980, while they were working *Page 1178 
on the roof of a building then owned by Dixie which was located in an industrial park area near Oneonta, Alabama, in Blount County.
"Dixie had contracted with Irondale Fabricators, an independent contractor, for the installation of a sand storage work on the roof of the Dixie building. Bacon and Tuggle were employees of Irondale Fabricators and were engaged in cutting a rectangular opening in the roof approximately eight feet by six feet, one side of which was to be located approximately eight inches from the edge of the roof.
"The roof itself was supported by channel beams, two of which crossed the area where the opening was to be made by Bacon and Tuggle. Using a cutting torch, Bacon began cutting through the channel beams or "purlins" that were supporting the section of the roof being removed. The two channel beams had already been cut in three places and Bacon was beginning to make the final cut. He testified as follows:
 "`Q. Okay. And you must have had some concern about that purlin going ahead and falling, because you had one guy holding over here and you had one guy holding over here.
 "`A. The reason I had the concern of that purlin falling is I knew that center piece was going to fall, because I had cut it at one end and was in the process of cutting the other end, but I didn't feel safe squatting down next to the edge, that close to the edge and holding with one hand and cutting with the other.
 "`Q. So you got Tuggle up there and he stood right by you?
"`A. Yes, sir.
"`Q. How close together were y'all?
"`A. Almost touching.
 "`Q. Was that kind of awkward? Did you have to lean over him to make your cut, or did he lean over you to make his hold?
 "`A. No, sir. He squatted down next to the side and I kind of got down on one knee right next to him and reached over to make the burn.
"`Q. Who was closest to the outside of the building?
"`A. Gordon [Tuggle].
 "`Q. So you had Gordon holding one end of the purlin that you were cutting to complete the cut and you had Mike holding the other end which had already been cut.
"`A. Yes, sir.
 "`Q. Did you make your cut completely before the tin fell with you?
"`A. We — yes, sir.
 "`Q. And how long had you completed your cut before it fell?
"`A. Just as soon as I made the cut.'
"Both Bacon and Tuggle were located over a part of the channel beam or purlin a short distance from the point where it was provided support. Bacon was engaged in cutting through the channel beam while Tuggle was going to hold the part of the beam which would have been freed by the cut so as to prevent it from falling. After the cut in the beam had been made, that portion of the channel beam immediately under Bacon and Tuggle collapsed so that both of them fell to the ground causing the injuries for which they now make claim.
"In opposition to Dixie's motion for summary judgment, Bacon and Tuggle argue that the collapse of the channel beam at the point of its support was the result of a defective weld made to connect the channel beam at the point of its support and that at least a scintilla of evidence has been presented to establish Dixie's liability to Bacon and Tuggle for the injuries resulting from the collapse of the channel beam.
"Tuggle has submitted the affidavit of Bruce Monical, a person having expert knowledge concerning the safe erection of steel membered buildings. Having inspected the entire building, Monical stated under oath the following regarding the area where the cut in the roof was made and Bacon and Tuggle fell:
 "`. . . The quality of the work of the old building appeared to be excellent and the workmanship was done in conformity with a prefabricated construction of the beams, purlins, etc., according to a plan. *Page 1179 
The addition which was added, beam for beam, purlin for purlin, and a continuance of the roof top appeared not to have been done so. That is, it was obviously constructed of scrap material which had not been specifically manufactured for construction according to a designed plan. Rather, the uneven lengths, sizes, and measurements of the structural steel members of this addition were so variable and non-uniform as to readily indicate to anyone knowledgeable in steel erection that this construction was not done according to a designed plan. Also, the welding and joining of the steel structural members, purlins, etc., as I found them to be was done in a very slipshod and haphazard matter [sic]. The welding was of a very poor quality and the area where the eave strut in question rested on top of a canopy beam and butted against the end of a joining eave strut was of very poor quality. Through pictures exhibited to me by the plaintiff's attorney, I was shown the eave strut in a bent downward position as it was supposedly located in its condition after the fall of Billy Bacon and Gordon Tuggle. Portions of these eave struts were still in place at the time of my inspection and they are properly described as channel beams or eave struts. It is my judgment from observing the eave struts that had they been properly welded at the areas where they butted against each other on top of the channel beam, the six foot seven inch eave strut extending from the top of the beam out toward the area where the cut was made on the eave strut would not have bent and given way under the weight of the two men as it did. I made an inspection of the eave strut on the other side of the cut and found it to be of a similar type and kind channel beam. It was properly attached to the channel beam on which it rested which in my judgment explains the failure of it to give way and bend when the two men made the first cut on that side of the gap.
 "`There is no doubt in my mind but this addition to the main building, which has been pointed out to me to be the location where this event occurred, was constructed and erected in a very careless and negligent way, and anyone expected to have crawled about on the roof of this building, should have been warned of the dangers inherent in the quality of the construction done in this addition to the original building. It is further clear to me that had any inspection been made of this building for safety reasons it would not have passed as a building which had been constructed to compose a reasonably safe structure upon its completion.'
"For purposes of Dixie's motion for summary judgment, this Court will consider that the condition of the collapsing channel beam was defective due to a defective weld at its point of support within a few feet of where Bacon and Tuggle were standing and making a cut in the beam. There remains the question whether liability can be imposed upon Dixie for this defective condition.
"In support of its motion for summary judgment, Dixie has submitted the affidavit of Clyde C. Turner, its assistant general manager, who states:
 "`. . . The building where this accident occurred was constructed during the spring of 1980 by an independent contractor. To the best of my knowledge, no employees of Dixie Bronze assisted in or directed the actual construction of this building. I was not aware of any allegedly defective condition existing in the roof of this building. The roof was approximately thirty feet high and to the best of my knowledge no one from Dixie Bronze had the occasion to climb up to the roof to inspect the welding of the eave struts or purlins. Furthermore, I am aware of no one at Dixie Bronze who had any knowledge whatsoever that the building was not constructed properly or that it presented any hazards. The building was functional for the purpose that it was built. The plaintiffs were employees of Irondale Fabricators, independent contractors employed to install a sand tank in the building. Dixie Bronze *Page 1180 
did not control the employees of Irondale Fabricators nor did they tell the plaintiffs how to perform this work. Because the employees of Irondale Fabricators had been working on ladders in and around the roof prior to this accident, they had a better opportunity to inspect the roof structure than did the employees of Dixie Bronze. Furthermore, the roof structure adequately held the employees of Irondale Fabricators until such time that there were four cuts made in the roof's support structures by using welder's torches.'
"In another affidavit, Alfred H. Turner, Vice President and General Manager of Dixie, states under oath:
 "`. . . The building where this accident occurred was constructed during the spring of 1980 by an independent contractor. I believe that this work was contracted to Turner Welding and Repair, Inc., from Birmingham, Alabama. No employees of Dixie Bronze assisted in or directed the actual construction of this building. Furthermore, I am aware of no one at Dixie Bronze who had any knowledge whatsoever that the building was not constructed properly or that it presented any hazards. I am not aware of any allegedly defective conditions existing in the roof of this building.'
"In Chrysler Corporation v. Wells, 358 So.2d 426 (Ala. 1978), Wells, a welder employed by Engineering Maintenance Services, an independent contractor, was engaged in work for his employer at the Chrysler plant in Huntsville, Alabama. Although there were ladders available for Wells to use, Wells instead attempted to climb to the work area approximately thirty feet above floor level by climbing up a storage bin. He supported his weight by holding on to wire baskets placed in the storage bins to contain products belonging to Chrysler. When two of the baskets broke loose from the metal bins under his weight, he fell approximately twenty feet to the floor.
"Wells then made claim for his injuries against Chrysler. His theory of liability was that as an employee of an independent contractor, he was an invitee on Chrysler's premises and that Chrysler negligently failed to provide him with a safe place to work. Reversing the verdict and judgment rendered in favor of Wells, the Supreme Court of Alabama concluded that under the evidence Wells had failed to establish by the evidence a breach of any duty by Chrysler to him. The Court defined the duty owed by the owner of premises to an independent contractor as follows:
 "`The owner of premise is not responsible to an independent contractor for injuries from defects or dangers which the contractor knows of, or ought to know. But if the defect or danger is hidden and known to the owner, and neither known to the contractor, nor such as he ought to know, it is the duty of the owner to warn the contractor, and if he does not do this he is liable for result of injury . . .'
"In Quillen v. Quillen, 388 So.2d 985 (Ala. 1980), the Court quoted with approval from its earlier opinion in Lamsom[Lamson] Sessions Bolt Company v. McCarty, 234 Ala. 60,173 So. 388 (1937), as follows:
 "`The duty to keep premises safe for invitees applies only to defects or conditions which are in the nature of hidden dangers, traps, snares, pitfalls, and the like, in that they are not known to the invitee, and would not be observed by him in the exercise of ordinary care. The invitee assumes all normal or ordinary risks attendant upon the use of the premises, and the owner or occupant is under no duty to reconstruct or alter the premises so as to obviate known and obvious dangers, nor is he liable for injury to an invitee resulting from a danger which was obvious or should have been observed in the exercise of reasonable care.'
"Speaking further to the same issue, the Supreme Court stated:
 "`The entire basis of an invitor's liability rests upon his superior knowledge of the danger which causes the invitee's injuries. *Page 1181 Gray v. Mobile Greyhound Park, Ltd., 370 So.2d 1384
(Ala. 1979); Tice v. Tice, 361 So.2d 1051 (Ala. 1978). Therefore, if that superior knowledge is lacking, as when the danger is obvious, the invitor cannot be held liable.'
"Also see, e.g., Crawford Johnson Co. v. Duffner, 279 Ala. 678, 189 So.2d 474 (1966); Evans v. Kendred, 362 So.2d 206
(Ala. 1978); Veal v. Phillips, 285 Ala. 655, 235 So.2d 799
(1970).
"No evidence has been presented in the present case to establish that Dixie knew or in the exercise of reasonable diligence should have known of the defective condition of the channel beam and either taken steps to eliminate the defects or warned Irondale Fabricators or its employees, Bacon and Tuggle, of the same. Dixie has submitted evidence establishing that the portion of the building containing the defective channel beam was constructed by an independent contractor and that Dixie itself had no knowledge of the defective condition. The roof had been in use for a number of years. So far as appears from the evidence, Dixie had no reason to be concerned about or to inspect the channel beam here involved.
"Bacon and Tuggle also argue in opposition to Dixie's motion for summary judgment that Dixie as the owner of the building owed Bacon and Tuggle a nondelegable duty to provide a safe place for them to work because of the inherent or intrinsically dangerous nature of the work being performed by Bacon and Tuggle.
"In Evans v. Kendred, 362 So.2d 206 (Ala. 1978), this same argument was made by Evans. Evans was a pipe fitter whose duties included threading forty foot sections of pipe into pipe racks which were constructed by his employer, Fish Engineering and Construction Company. At the time of his injury, a crane was being used to position a section of pipe on the rack upon which Evans was standing. The crane was being operated by another Fish employee. The injury was said to have occurred because the operator of the crane `boomed' the crane boom into Evans, causing the pipe to slip and Evans to be knocked to the ground.
"Affirming the grant of summary judgment in favor of Hunt Oil Company, the owner, the Supreme Court of Alabama rejected the argument that the work being performed by Evans was inherently or intrinsically dangerous. The Supreme Court stated:
 "`There is no dispute that the plaintiff was injured while performing his work as an employee of Fish, which was an independent contractor. He argues, nevertheless, that Hunt, which owned the premises, is liable for his injuries because the work which he was performing was inherently or intrinsically dangerous. There is no evidence before the Court on motion for summary judgment that the work which the plaintiff was performing was inherently or intrinsically dangerous. Whether Hunt would be liable to an employee of an independent contractor had that been proved, we need not decide. Certainly, the work being performed by the plaintiff is not inherently dangerous as a matter of law and:
 "`"Ordinary building operations or activities, including both construction and demolition, are generally not considered work of an inherently or intrinsically dangerous character rendering the employer-owner liable for injuries resulting from the negligence of an independent contractor in doing the work. . . ." 41 Am.Jur.2d Independent Contractors, § 43.'
"In Scoggins v. Atlantic Gulf Portland Cement Co., 179 Ala. 213,60 So. 175 (1912), Scoggins as administrator of the estate of a deceased worker brought suit for the wrongful death of his intestate who was killed when the veranda of a clubhouse or boarding house fell on him. At the time, the veranda was in the process of construction and was not covered but some planks or lumber which had been placed on the veranda to be used in the construction formed a shelter from the rain. The veranda was only temporarily braced or propped. The deceased was not engaged in *Page 1182 
the work of building the veranda but was employed, as foreman of a squad of men, in building a road near the place of the accident and went there with his men only to get out of the rain.
"Affirming the action of the trial court in granting the affirmative charge in favor of the defendant, the Supreme Court of Alabama rejected the argument that the erection of the clubhouse or boarding house was an undertaking which was intrinsically or inherently dangerous. The fall of the veranda was attributed to the failure to sufficiently prop or support the structure while it was being erected. The Supreme Court stated in its opinion:
 "`Again, the work or undertaking being by no means necessarily dangerous, if proper care were exercised in its execution, any negligence in its prosecution (if any such there was) was merely in the mode and manner in which the contractor or his agents or servants were performing the work; and for this reason the defendant was not liable.'
"Bacon and Tuggle have cited the decision of the Supreme Court of Alabama in Golson v. W.A. [W.F.] CovingtonManufacturing Co., 205 Ala. 226, 87 So. 439 (1920), in support of their argument that the nature of the work being performed by them was inherently dangerous. However, that case involved a claim for the wrongful death of Golson's five year old son who was killed while playing in unenclosed premises owned by the defendant when the child accidentally touched a hay wire connected to a 2,000 volt line. It was there asserted that a wire carrying 2,000 volts and within the reach of children was a dangerous instrumentality. The Court concluded there that the owner had a nondelegable duty to exercise reasonable care and diligence to protect third persons, especially children, from such a dangerous instrumentality.
"The work being performed by Bacon and Tuggle in removing a section of the roof from Dixie's building would not be intrinsically or inherently dangerous if it had been performed with the exercise of reasonable care, skill and diligence. Under the circumstances presented in this case, Dixie did not, as owner, have a [non]delegable duty to provide Bacon and Tuggle with a safe place to work.
"No evidence has been presented to establish any liability of Dixie to Bacon and Tuggle.
"Accordingly, the Motion for Summary Judgment filed by Dixie Bronze Company, Inc., a corporation, is hereby granted. Judgment is hereby rendered in favor of the defendant, Dixie Bronze Company, Inc., a corporation."
See, also, the opinion of this Court in Secrist v. Mark IVConstructors, Inc., 472 So.2d 1015 (Ala. 1985).
AFFIRMED.
TORBERT, C.J., and JONES, ALMON, SHORES and BEATTY, JJ., concur.